# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

FRANCES FEAGANS-KING,                )
                                     )
              Plaintiff,             )
                                     )
       v.                            )          Case No. 20-cv-3121
                                     )
KILOLO KIJAKAZI, Acting              )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Frances Feagans-King appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Feagans-King filed a Motion for Summary Judgment and Memorandum of Law in Support of Vacation/Remand of Decision Denying Disability (d/e 18).   The Defendant Acting Commissioner filed a Motion for Summary Affirmance (d/e 22).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered November 4, 2020 (d/e 14).  For the reasons set

forth below, the Decision of the Commissioner is REVERSED and REMANDED.

## BACKGROUND

Plaintiff Feagans-King was born on August 14, 1958, and has a master's degree in divinity.  Feagans-King's past relevant work was as an administrative clerk, medical records clerk, and systems analyst.  Feagans-King alleged that she became disabled on March 31, 2017 (Onset Date).  She has not engaged in substantial gainful activity since the Onset Date.  Feagans-King was insured for Disability Benefits through March 31, 2021 (Last Date Insured).  She suffered from Sjogren's syndrome, fibromyalgia, diabetes mellitus with peripheral neuropathy, degenerative disc disease of the lumbar spine, obesity, and depression.  Certified Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), at 15, 17-19, 23, 39, 333, 695.

## STATEMENT OF FACTS

### Evidence Submitted Before the Evidentiary Hearing

On February 11, 2016, Feagans-King saw physician's assistant Tom Jenkins, PAC, for a follow up on Feagans-King's sleep apnea and hypersomnia.  Her score on the Epworth Sleepiness questionnaire was

19.[1]  She used a continuous positive airway pressure (CPAP) machine at night and reported continuing symptoms of restless sleep, excessive daytime sleepiness, fatigue, and driving impairment.  R. 336.  On examination, Feagans-King was 72 inches tall, weighed 278 pounds, and had a body mass index (BMI) of 37.72.  She was in no acute distress and had no observed drowsiness.  She had a normal gait and station and normal strength in her extremities.  R. 337.  Jenkins prescribed Nuvigil for hypersomnia and ropinirole for restless leg syndrome.  R. 338.

On March 24, 2016, Feagans-King saw physician's assistant Jenkins for a follow-up on her sleep apnea.  The CPAP machine improved her symptoms, but she could not afford the $500 deductible for Nuvigil from her insurance. The records stated that Feagans-King had a history of Sjogren's syndrome, diabetes, and restless leg syndrome. R. 333.[2]  On examination, Feagans-King was in no acute distress and had no observed drowsiness.  She was alert, oriented, and had normal gait and station.  Examination of her upper and lower extremities was normal.  Jenkins changed Feagans-King's hypersomnia medication to Provigil.  R. 334-35.

---

[1] A score of 10 or more indicated a moderate to high probability of excessive daytime sleepiness.  R. 1249.
[2] Sjogren's syndrome is a disorder of the immune system that typically causes dry eyes and a dry mouth. The condition sometimes also causes fatigue.  Sjogren's syndrome - Symptoms and causes - Mayo Clinic, at www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/, visited on September 9, 2021.

On June 6, 2016, Feagans-King saw rheumatologist Dr. Sandra Hoffmann, M.D.  She reported a fibromyalgia flare up with pain all over for several weeks.  Dr. Hoffmann asked about depression "as her body language [was] highly suggestive."  Feagans-King was uncertain.  She had recently moved and engaged in more than normal physical activity and had sprained her ankle a year earlier.  She reported swelling in her hands and ankle consistent with inflammatory arthritis.  On examination, Feagans-King has a slumped body suggestive of depression and her hands and left ankle were mildly swollen.  Her physical examination was otherwise normal.  R. 615-16.  Dr. Hoffmann prescribed prednisone and gabapentin.  She also recommended that Feagans-King try to get eight hours of sleep with her CPAP.  R. 616.

On December 16, 2016, Feagans-King saw her primary care physician Dr. Matthew Breeden, M.D. for a follow up on her diabetes and fatigue.  Feagans-King reported that she started a new job and had an erratic schedule working day shifts one day and evening shifts the next.  She was easily fatigued and her tiredness made managing her diet more difficult.  R. 494.  On examination, Feagans-King was oriented and in no distress; she had normal mood, affect, behavior, judgment, and thought content; the rest of the examination showed normal results.  R. 495.  Dr.

Breeden assessed fatigue, unspecified type, type 2 diabetes without complication and without long-term current use of insulin.  Dr. Breeden wrote a letter suggesting regular hours and a maximum of four consecutive days on duty.  R. 494.

On January 30, 2017, Feagans-King saw Dr. Breeden.  She stated her Jardiance medication for diabetes was becoming too expensive.  On examination, Feagans-King was oriented and in no distress; she appeared tired; she had normal mood, affect, behavior, judgment and thought content.  Dr. Breeden changed Feagans-King's diabetes medication to Invokana.  R. 404, 514.  Feagans-King also saw a medical student Brian Kang in Dr. Breeden's office during this visit and reported that her peripheral neuropathy was worsening and she had balance issues while walking.  On examination, she had decreased sensation on monofilament testing.  R. 407, 517.[3]

On April 1, 2017, Feagans-King went to the emergency room at HSHS St. Elizabeth's Hospital in Belleville, Illinois, complaining of acute chest pain.  Her pain improved with administration of morphine and nitroglycerin.  R. 391.  On examination, Feagans-King was oriented with a

---

[3] Feagans-King repeatedly refers to Kang as a podiatrist.  The records show that he was a medical student.  R. 516.

normal affect; she was in no apparent distress; her respiratory and heart examinations were normal; she had normal range of motion; she had no gross motor defects. R. 392.  She was admitted to the hospital.  A stress test performed April 2, 2017 showed no indication of myocardial infarction or ischemia.  R. 387.

On April 28, 2017, Feagans-King saw Dr. Breeden.  She had been extremely fatigued for the past two to three months and she could not work for more than an hour without getting exhausted and had been taking frequent naps.  She also reported back pain and that she was doing okay with her diabetes.  On examination, Feagans-King was oriented and in no distress.  Her mood, affect, behavior, judgment, and thought content were normal.  She appeared tired and had tenderness in her lumbar spine, but she had normal range of motion, no bony tenderness, and no swelling.  Straight leg raising testing was negative.  R. 400.  Dr. Breeden stated that multiple factors contributed to her fatigue including Sjogren's syndrome, depression, and polypharmacy.  Dr. Breeden stated,

> I am most concerned about the possibility of polypharmacy, and I explained my reasoning. I encouraged her to try cutting her clonazepam and/or soma in half, to see how she is affected. She is on a number of sedating medications, and I do not think they are doing her much benefit from a fatigue standpoint.

R. 399.  Dr. Breeden stated that Feagans-King's type 2 diabetes mellitus was without complications and without long-term use of insulin.  Her diabetes has slightly improved at this visit.  Dr. Breeden adjusted and refilled her diabetes medications.  He also assessed low back pain that was not well-controlled and prescribed physical therapy.  R. 399.

On May 1, 2017, Feagans-King saw Hoffmann.  She was leaning against the wall asleep when Dr. Hoffmann entered the examination room. R. 632.  Feagans-King reported "profound fatigue" that made her unable to work.  She was on short-term disability from her employer and reported that she was sleepy during the day and her memory was affected.  She reported low back pain.  An MRI from February 2017 showed "significant neuroforaminal compromise at several levels."  A test a year earlier showed peripheral neuropathy.  R. 628.  On examination, Feagans-King had moderately obese hypersomnolence, normal motor strength, normal extremities, and her sensory exam was intact.  She had tenderness in the lumbar and sacroiliac spine and the back pain was worsened by movement of her hips.  R. 635.  Dr. Hoffmann recommended extending Feagans-King's short-term disability until her next visit in three months.  Dr. Hoffmann said, "Her cognitive dysfunction makes her computer work untenable.  Fatigue is also incapacitating."  R. 632; see R. 350.  Dr.

Hoffmann wrote a letter To Whom it May Concern.  The body of the letter
stated:

> Frances E Feagans-King is under my care, and I have
> extended her short term disability and notified her that she may
> return to work on 8/1/2017 after testing and reviews have been
> performed.

> If there are any questions, please feel free to contact my office.

R. 353.

On May 8, 2017, Feagans-King had an MRI of her lumbar spine.  The
MRI results were very similar to a 2016 MRI with moderate lateral
narrowing at L2-3 and flattening of the thecal sac; as well as a "tiny central
focal disc protrusion L1-2."  R. 601.

On May 9, 2017, Feagans-King's employer, the Red Cross, wrote Dr.
Hoffmann requesting more information about Feagans-King's short-term
disability.  Feagans-King's employer sent a copy of her current job
description and questionnaire to Dr. Hoffmann.  Dr. Hoffmann completed
the questionnaire on May 23, 2017.  R. 645.  She opined that Feagans-
King had both physical and mental impairments that limited major life
activities.  Dr. Hoffmann stated, "Pt has cognitive dysfunction which is
limiting her memory—Chronic pain due to lumbar radiculopathy—very
limited mobility unable to do any physical work."  R. 643.  Dr. Hoffmann
opined that Feagans-King could not perform "all functions" of her current

job based on the job description.  She could not perform the job functions due to "Cognitive functions & memory loss" and "Chronic Pain & fatigue." R. 643.  She opined that the impairments were permanent, and no accommodation would enable Feagans-King to perform her current job duties.  Dr. Hoffmann could not state with a reasonable degree of certainty when Feagans-King would be able to return to work.  R. 644.

On May 17, 2017, Feagans-King saw neurologist Dr. Bassam Malo, M.D., for an evaluation for neuropathy.  She reported tingling in her feet and pain radiating up and down both legs. She said that her hands were constantly numb and she was having a hard time standing for long periods due to pain.  She also reported balance problems and that she was lightheaded when bending over and raising her head, and sometimes when stood up from sitting.  Feagans-King reported choking when eating and problems with memory and concentration.  R. 677-78.  The May 8, 2017 MRI showed moderate bilateral narrowing at L2-3 and flattening of the thecal sac.  Dr. Malo stated that a February 2016 EMG study showed evidence of axonal, sensorimotor neuropathy in both lower extremities.  R. 678.  On examination, Feagans-King was awake, alert, followed commands, and was oriented.  The examination of her cranial nerves was normal and her motor exam showed normal bulk and tone with no

abnormal movements.  She had normal strength in her neck and extremities, normal gait and stride, normal heel walk, and normal toe walk. She swayed with the Romberg test, and she had difficulty tandem walking. Dr. Malo assessed cognitive impairment and hypersomnia likely due to polypharmacy; axonal neuropathy with predominant symptoms of pain, restless leg syndrome, and sensory ataxia; possible entrapment neuropathy in the upper limbs; and lumbar radiculopathy.  R. 682.  Dr. Malo recommended reducing Requip medication and discontinue her Soma medication.  He also ordered a nerve conduction/EMG study of her lower limbs. R. 682.

On May 19, 2017, Feagans-King completed a Function Report-Adult form (Function Report).  R. 244-51.[4]  She stated she could not work because of her fatigue, she could not focus at work, she forgot to complete tasks, she fell asleep at work, and she missed important instructions.  She could not sit for long periods, and she had balance problems.  She said that she could not work for more than four days in a row.  When she worked for four days in a row, "I am worthless for 3 days and not always able to work the next day."  She also had problems speaking due to dry mouth.  R. 244.

---

[4] The Court uses the date set forth in the Index of Exhibits for the Function Report.  Feagans-King dated the form August 14, 1958, her birthdate.  R. 251.

In a typical day, Feagans-King checked her phone when she woke, took medicine, fed pets, and walked the dog.  She lay down to rest, ate lunch, took a nap, worked on a hobby, rested on the couch, listened to a book, ate dinner, read, took medicine, and played games on her phone or crocheted until sleepy.  R. 245.  Her hobbies included listening to books, playing the psalter or mandolin, and crocheting.  R. 248.  Feagans-King had trouble falling asleep due to her medications.  R. 246.

Feagans-King took care of her personal care, although she was too tired to bathe daily.  She bathed or showered on a weekly basis and needed to be reminded to bathe and to take medications.  She forgot to take one dose of medication per week.  R. 245-46.  Feagans-King prepared snacks and made coffee.  She did not cook, but she sometimes helped prepare vegetables for meals.  After performing prep work for 15 minutes, she had to sit down.  She took out the garbage and vacuumed the home.  She said that after vacuuming for 45 minutes, "I'm done in for the day."  R. 246.

Feagans-King went out daily and could go out alone.  She walked, drove a car, and rode in a car when she went out.  She shopped for groceries only if she was getting a couple of things, otherwise she shopped online once a month.  She went to church weekly, and she spoke to

neighbors a couple of times a week.  She preached at church twice a

month and assisted on the other Sundays.  R. 248.  She had no problems

with family, friends, neighbors, or others.  R. 2249.

Feagans-King opined that her impairments affected her ability to lift,

squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember,

complete tasks, concentrate, understand, follow instructions, and use her

hands.  Back pain caused her positional limitations and she opined that she

could sit for one to two hours, walk a block, and pay attention for five

minutes.  She did not finish what she started.  She could follow short

written instructions, but she had problems remembering oral instructions

and sometimes missed some aspect of oral instructions.  R. 249.  She got

along with authority figures, and she could handle stress and changes in

routine "pretty well."  She rode electric scooters in stores and used a cane

for balance when she walked outside.  R. 250.

On May 26, 2017, Dr. Malo conducted a nerve conduction/EMG study

on Feagans-King.  The study showed evidence of chronic radiculopathy in

her lower extremities, but no evidence of entrapment neuropathy in her

upper extremities. R. 665.

On June 12, 2017, Feagans-King saw medical student Reema

Agarwal in Dr. Breeden's office.  She reported continuing fatigue and a

depressed mood.  She had been let go from her job at the Red Cross.  Her neurologist recommended that she stop taking Soma for her restless leg syndrome, but her night-time leg pain returned so she restarted the medication.  She reported that she did not sleep well.  Agarwal noted that Feagans-King had an EMG study indicating borderline carpal tunnel syndrome in her left arm and some active nerve damage in the left side of her back.  The neurologist had referred her to a pain management specialist.  Feagans-King was tolerating her diabetes medications well, but reported problems eating on a regular schedule.  R. 576.  On examination, she was oriented and visibly fatigued.  Sensory monofilament testing showed decreased sensation in her feet.  R. 577.  Agarwal assessed adequate control of Feagans-King's diabetes with medication and recommended daily foot exams in light of decreased sensation.  Agarwal recommended weaning off Soma to address Feagans-King's fatigue and noted, "It is currently unsure whether her fatigue is primarily due to her illnesses or due to medications prescribed.  Polypharmacy is a concern for her and should be monitored with respect to her fatigue."  R. 576.

On July 20, 2017, Feagans-King saw state agency psychologist Dr. Harry J. Deppe, Ph.D., for a psychological examination.  R. 694-98.  Dr. Deppe reviewed Dr. Breeden's medical records for Feagans-King.  R. 695.

She was married, had two adult children, and said she was treated for depression in the 1980s.  She was not under the care of a psychologist or psychiatrist and was taking no psychotropic medications.  Her sleep was fair due to sleep apnea and she appeared to be functioning at an average level of intellectual ability.  She denied having suicidal or homicidal ideations.  R. 695.  Feagans-King spent her time playing the piano, cooking, cleaning, and doing laundry.  She also spent time on the computer, paying bills, crocheting, and writing.  R. 697.  On examination, her mood and affect were unremarkable; her eye contact was poor; she had no difficulty staying focused; and her answers and comments were coherent and relevant.  She was oriented and her fund of knowledge was good.  Her remote and recent memory were good, her abstract reasoning was within normal limits, and she could perform simple calculations.  Her daily activities indicated that she could function independently, her relationship with others was good, and she had adequate ability to complete tasks.  R. 697.  Dr. Deppe opined that Feagans-King retained the ability to relate to others, understand and follow simple instructions, and maintain attention to perform simple, repetitive tasks; and she had a good ability to withstand stress and pressure of day-to-day work activity.  Dr. Deppe diagnosed no mental impairments.  R. 697-98.

On the same day, July 20, 2017, Feagans-King saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 700-03.  She had back pain, fatigue, headaches, and no feeling in her feet.  She used a cane for the last four months.  R. 700.  On examination, Feagans-King was in no acute distress; she could walk 50 feet without a cane; her sensory exam was normal; she could appreciate pinprick sensation in all extremities; she had no swelling, redness, or heat in her joints; and she had no paravertebral muscle spasms.  She had normal grip strength and could perform fine and gross manipulations bilaterally.  Lumbar spine flexion was normal; she had normal range of motion in her joints; straight leg testing was negative.  Dr. Chapa concluded that the examination was unremarkable except for absent ankle reflexes.  R. 701-02.

On July 31, 2017, Feagans-King saw Dr. Hoffmann.  She reported that she had been doing well since the last visit and had minimal morning stiffness.  She had significant fatigue and paresthesia in her feet and lower legs.  Dr. Hoffmann encouraged Feagans-King to use her CPAP more to improve her sleep.  R. 712.  On examination, Feagans-King was alert, oriented, and in no acute distress; she had no gross focal neurological defects; she had mild synovitis in the hands and wrists and tenderness throughout her spine; she had moderate arthritic changes in her knees.  Dr.

Hoffmann assessed Sjogren's syndrome and inflammatory arthritis "under acceptable control on current regimen," but Feagans-King's "neuropathic symptoms needing further control as does sleep disorder."  R. 712.  Dr. Hoffmann adjusted Feagans-King's medications.

On August 2, 2017, Feagans-King saw pain specialist Dr. Chad C. Shelton, M.D.  She reported back pain for seven years.  The pain worsened with standing and walking and improved with leaning on a shopping cart and sitting.  On examination, Dr. Shelton noted 5/5 symmetric strength in a seated position with no sensory deficits.  She had tenderness along the lumbar spine and increased pain with extension facet joint loading.  Dr. Shelton recommended facet joint injections.  R. 855-56.

On August 14, 2017, Feagans-King saw Dr. Breeden.  She reported tremors before meals in her hands, but had no issues with her gait.  R. 823. On examination, Feagans-King was alert, oriented, and in no distress; her mood, affect, behavior, judgment, and thought content were normal. Dr. Breeden noted a subtle rest tremor in her hands.  R. 825.  Dr. Breeden assessed type 2 diabetes mellitus without complication, without long-term current use of insulin and noted that Feagans-King had been off her diabetes medication for three months due to insurance issues, but she was back on her medication at the time of the office visit.  R. 823.

On August 21, 2017, Feagans-King saw Dr. Chad Shelton.  On examination, Dr. Shelton noted bilateral tenderness along the lumbar spine and increased pain with extension facet joint loading.  He administered facet joint injections at L3-L4, L4-L5, and L5-S1.  R. 853.

On August 28, 2017, Feagans-King's spouse spoke to Dr. Breeden. Her spouse reported that she had had balance issues for the past several days, had an unsteady gait, and fell into walls.  The spouse reported poor cognition and slowed activity.  Feagans-King was difficult to wake from sleep and she had run out of Cymbalta and Ambien.  Dr. Breeden suggested taking Feagans-King to the emergency room to rule out a stroke.  R. 736.

On August 28, 2017, Feagans-King went to the emergency room as suggested by Dr. Breeden.  A chest x-ray was normal, and a head CT scan was normal.  R. 867-68.  Her condition improved, and she was discharged. R. 869.

On August 30, 2017, state agency physician Dr. Julio Pardo, M.D., prepared a Physical Residual Functional Capacity Assessment for Feagans-King.  R. 86-89.  Dr. Pardo opined that Feagans-King could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday;

occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; and never climb ladders, ropes, or scaffolds.  He opined that Feagans-King should avoid concentrated exposure to extreme heat or cold; wetness; humidity; vibration; fumes, odors, gases, or poor ventilation; and hazards.  R. 86-88.[5]

On October 4, 2017, Feagans-King saw Dr. Breeden.  Her fatigue was worse in the mornings when she first awoke and she bumped into things and slurred her speech.  Dr. Breeden noted that she went to the emergency room for fatigue.  A CT scan was negative.  Feagans-King reported yeast infections since she started taking Invokana.  R. 782-83.  On examination, Feagans-King was alert, oriented, and in no distress; she appeared tired; she had normal mood, affect, behavior, judgment, and thought content.  R. 783-84.  Dr. Breeden recommended weaning down sedating medications, starting with the Soma, and stopped the Invokana due to the side effects.  He planned to recheck her A1c after a couple of months to see if she was able to control her diabetes with lifestyle changes.  Dr. Breeden said that if her A1c did not improve, she would likely need to consider an insulin regimen.  R. 782.

---

[5] Feagans-King erroneously states that the record did not contain evidence that she could frequently lift 10 pounds and balance.  Dr. Pardo's opinions show this statement is incorrect.  Dr. Madala, discussed infra, also agreed with Dr. Pardo's opinions.

On November 6, 2017, state agency psychologist Dr. David Gilliland, Psy.D., prepared a Psychiatric Review Technique for Feagans-King.  Dr Gilliland opined that Feagans-King had medically determinable mental impairments of anxiety and obsessive-compulsive disorders and that her mental disorders mildly limited her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  R. 101.  Dr. Gilliland opined that Feagans-King's mental impairments were non-severe.  R. 104.

On November 13, 2017, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Function Capacity Assessment.  R. 105-08.  Dr. Madala opined that Feagans-King could lift 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk for two hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; frequently balance; and never climb ladders, ropes, or scaffolds.  Dr. Madala opined that Feagans-King should avoid concentrated exposure to extreme cold; extreme heat; wetness; humidity; vibration; fumes, odors, dusts, gases, and poor ventilation; and hazards. R. 104-07.

On February 15, 2018, Feagans-King saw Dr. Rebekah Hovland, M.D., to establish primary care.  Dr. Hovland administered a PHQ-9

screening test for depression.  The test indicated Feagans-King had

moderate depression.  R. 925.  On examination, she was 5 feet 10.7 inches

tall, weighed 264 pounds, and had a BMI of 37.13.  She was oriented, in no

acute distress, but "appeared to not be feeling well."  She had normal gait

and station, normal muscle strength/tone, normal judgment and insight, and

normal mood and affect.  R. 929.  Dr. Hovland recommended counseling

for Feagans-King's depression.

On February 27, 2018, Feagans-King saw cardiologist Dr. Giselle

Baquero Caranama, M.D., for a cardiac consultation.  Dr. Baquero

Caranama found noncardiac chest pain.  She also noted that Feagans-King

had poor social support.  Dr. Baquero Caranama recommended a social

work consultation for alternative community support options.  R. 879.

On March 23, 2018, Feagans-King saw Dr. Hovland.  Dr. Hovland

stated that Feagans-King's diabetes was poorly controlled.  She was not

compliant with her medications due to cost.  She reported no side effects

from her medication and her PHQ-9 screening test for depression indicated

moderately severe depression.  R. 910.  On examination, Feagans-King

was oriented, in no acute distress, but appeared not to be feeling well.  Her

mood and affect were restricted and sad; her judgment and insight were

normal.  Dr. Hovland found that Feagans-King's depression was poorly

controlled, and Feagans-King was on a waitlist to for a psychiatric evaluation.  R. 913.  Dr. Hovland prescribed hydroxyzine for anxiety.  R. 914.

On March 29, 2018, Feagans-King saw rheumatologist Dr. Krati Chauhan, M.D.  R. 950-54.  She was tired all the time and if she had three restless nights or could not sleep, she took Ambien.  She reported "memory fogginess" in which she could not think of a word she wanted to say and she forgot what she was doing.  She felt weak and reported dropping things; she reported getting dizzy and losing her balance because her legs felt like jelly.  She had numbness and tingling in her feet and her hands felt tight and hurt.  R. 950.  On examination, Feagans-King was alert, oriented, and in no acute distress; she appeared tired and sleepy; her range of motion was within normal limits.  R. 953.  Dr. Chauhan prescribed tapering off prednisone and a possible referral to neurology if the pain, weakness, and numbness worsened.  R. 954.

On April 4, 2018, state agency reviewer Niecy Anderson prepared a Medical Evaluation form for Feagans-King.  Anderson reviewed Feagans-King's medical records and concluded the state agency physicians Drs. Pardo and Madala's Residual Functional Capacity Assessments were

appropriate, and Feagans-King could perform her past relevant work.  R. 962-63.

On April 17, 2018, Feagans-King saw psychiatrist Dr. Dorcas Adaramola, M.D., to establish care.  R. 987.  She reported that she was disabled applying for disability.  She was unemployed and she and her partner Jane moved to Springfield, Illinois, from St. Louis two years earlier.[6] She previously worked as a pastor for a denomination in St. Louis.  She reported days of low energy.  She reported having multiple talents:  She was good at woodworking; she carved musical instruments; she was currently carving a violin; she was also building a dulcimer.  She managed her pain by focusing on other activity such as crochet and woodworking.  She also suffered from fatigue.  She spent time on golf, and she recently spent six to eight hours on the phone.  She talked to the president of a denomination, and she talked to several pastor friends of hers.  She played a game on her phone called Words with Friends.  R. 986-87.

On examination, Dr. Adaramola found that Feagans-King was oriented and had a depressed mood, reactive affect, and reduced eye contact.  She had normal psychomotor, linear and relevant thought

---

[6] The record elsewhere indicates that Feagans-King and her partner Jane Feagans-King are legally married.  R. 925

processes, no delusions or hallucinations, no suicidal or homicidal
ideations, good insight, normal concentration, and an intact recent and
remote memory.  Her station and gait were bradykinetic.  Dr. Adaramola
assessed major depressive disorder recurrent, prescribed Wellbutrin, and
continued Feagans-King's Cymbalta prescription.  R. 990.[7]

On April 18, 2018, state agency psychologist Dr. Larry Kravitz,
Psy.D., prepared a Medical Evaluation form for Feagans-King.  Dr. Kravitz
reviewed the psychological examination report of Dr. Deppe and affirmed
Dr. Deppe's finding that Feagans-King had a non-severe mental
impairment.  R. 966.

On April 18, 2018, state agency physician Dr. James Greco, M.D.,
prepared a Medical Evaluation form for Feagans-King.  R. 964-65.  Dr.
Greco reviewed her medical records and concluded that her physical
impairments did not meet or equal any impairments listed in the Social
Security Administration regulations' Listing of disabling impairments.  20
C.F.R. Part 404, Subpart P, Appendix 1 (Listings).  Dr. Greco further
opined that the Residual Functional Capacity Assessments by Drs. Pardo

---

[7] Feagans-Smith argues as grounds for reversal that the ALJ did not cite Dr. Adaramola's examination
notes filed as Exhibit 27 F below and located at R. 971-1009 in the record.  Feagans-Smith's argument is
misleading at best.  Duplicate copies of Dr. Adaramola's records are included in the record at R. 1257-
1281.  The ALJ cited to these duplicate copies of Dr. Adaramola's records.  The ALJ did not fail to
consider medical records from Dr. Adaramola.

and Madala were consistent with the overall medical evidence and not
unreasonable.  Dr. Greco stated that no further restrictions on Feagans-
King's physical functional capacity were indicated based on her medical
records.  R. 965.

On May 11, 2018, Feagans-King saw podiatrist Dr. Grant Gonzalez,
DPM, to pick up diabetic shoes and inserts.  She reported new pain on the
outside of her right foot that was worse with weightbearing.  On
examination, Feagans-King had pain with manual muscle testing.  She had
diminished light touch sensation bilaterally, and diminished pedal pulses
bilaterally.  Dr. Gonzalez assessed diabetes mellitus with some neuropathy
and right peroneal tendonitis.  He stated that the tendonitis may resolve
with use of the diabetic shoes and inserts.  If tendonitis continued, Dr.
Gonzalez would consider an ankle brace and/or physical therapy.  R. 1245.

On May 17, 2018, Feagans-King saw Dr. Adaramola.  She reported
that she was doing about the same, felt more optimistic but "started to feel
back to same level."   She was looking into writing a book about her
religious beliefs.  R. 992.  On examination, Feagans-King was oriented,
cooperative, calm, and hunched over; she had a depressed mood and a
restricted affect; she had decreased psychomotor and periods of latent
speech; she had normal eye contact, normal concentration, normal gait and

station, and intact recent and remote memory.  Her thought processes were linear and relevant, her insight was good, and her fund of knowledge was intact.  She had no delusions, hallucinations, or homicidal or suicidal ideations.  A PHQ-9 test showed moderately severe depression.  R. 995-96.  Dr. Adaramola assessed major depressive disorder, recurrent; and insomnia.  R. 996.  He continued Feagans-King's medications of Wellbutrin and Cymbalta.  Dr. Adaramola considered adding an atypical antipsychotic for mood stability, possibly Abilify.  R. 997.

On May 22, 2018, Feagans-King saw Dr. Hovland for a follow up on her diabetes.  She was taking Januvia and Lantus insulin.  R. 1235.  On examination, Feagans-King was in no acute distress.  She was overweight, but otherwise, her physical examination was normal.  R. 1238-39. Feagans-King's A1c was 10.5.  Dr. Hovland increased her Lantus insulin dosage.  R. 1239.

On July 3, 2018, Feagans-King saw Dr. Adaramola.  She missed her neurology appointment because the appointment was in the morning and she went in the afternoon.  She was put on a cancellation list because she had also missed an appointment when her ride did not show.  She reported that her hands were not getting better.  She could not do anything with her hands and she had been unable to succeed at a project and made

excuses.  She was sleeping better, but she reported "concentration

tremors."  She was doing okay with Cymbalta and tolerating Wellbutrin.  R.

1264.  On examination, Feagans-King was oriented and had a depressed

mood, reactive affect, reduced eye contact, latent speech, and decreased

psychomotor.  She also had linear and relevant thought processes, no

delusions or hallucinations, no homicidal or suicidal ideations, good insight,

intact recent and remote memory, and intact fund of knowledge.  She

reported impaired concentration, but Dr. Adaramola observed that she was

"able to focus on conversation without need for redirection."  She had a

bradykinetic gait.  R. 1267-68.  Dr. Adaramola administered a PHQ-9

depression questionnaire.  The results indicated moderately severe

depression and  Dr. Adaramola continued her medication.  R. 1268.

On July 3, 2018, Dr. Adaramola completed a Medical Source

Statement of Ability to do Work-Related Activities (Mental) form.  R. 968-

971.  Dr. Adaramola opined that Feagans-King had very good ability to

follow work rules and use judgment; good ability to relate to co-workers; fair

ability to interact with supervisors; and poor or no ability to deal with the

public, deal with work stress, function independently, or maintain

attention/concentration.  R. 968.  Dr. Adaramola stated, "She has difficulty

focusing and staying on task, fatigued and easily distracted by background

noise.  Instability and low energy."  R. 969.  Dr. Adaramola opined that Feagans-King had a fair ability to understand, remember, and carry out simple job instructions; and poor or no ability to understand, remember, and carry out complex or detailed instruction.  Dr. Adaramola stated, "She had difficulty with attention and concentration had 'word dropping' and response difficulty explain her thoughts to others."  R. 969.  Dr. Adaramola opined that Feagans-King had good ability to maintain personal appearance and relate predictably in social situations, and fair ability to behave in an emotionally stable manner and to demonstrate reliability.  Dr. Adaramola said, "She describes withdrawal from social settings, easily exhausted by social interactions, tearfulness and sensitivity to criticism."  R. 970.  Dr. Adaramola opined that Feagans-King would be reasonably expected to miss work two or more days a month and be late for work two or more days per month due to mental impairments and estimated that she would be off-task at work 25 to 30 percent of the workday.  R. 970.

On July 24, 2018, Feagans-King saw cardiologist Dr. Baquero Caranama.  She had an abnormal stress test in March 2018; the test showed a small area of ischemia.  Dr. Baquero Caranama prescribed diltiazem.  Feagans-King reported no changes in her symptoms of fatigue, including worsening fatigue. She reported that she now got very tired after

walking for 15 minutes.  R. 1148.  On examination, Feagans-King was in no acute distress; her neurological exam was normal with good muscle strength in all extremities.  R. 1150.

On August 1, 2018, Feagans-King saw Dr. M.H. Bakir, M.D., for sleep apnea.  Her answers to the Epworth Sleepiness Scale questionnaire was 20.  A score of 10 or more indicated a moderate to high probability of excessive daytime sleepiness.  R. 1249.  On examination, Feagans-King was oriented, in no acute distress, her recent and remote memory was intact, and her insight was intact; she had normal gait and station.  Dr. Bakir ordered a sleep study, adjusted the setting on her CPAP machine until the sleep study could be completed, and prescribed Provigil until sleep apneas were well controlled.  R. 1252-53.

On September 25, 2018, Feagans-King saw Dr. Adaramola. Feagans-King said she "relapsed a little bit."  She had restless sleep, including dreams of running away from things; she lost her health insurance; she had trouble making phone calls; she obtained support for her medications and diabetic supplies.  She was working on her book and looking for feedback on it.  R. 1004.  Feagans-King's church was looking for a pastor, but she did not think that she was "able to physically support working in that role."  R. 1008.  On examination, she was oriented,

cooperative, and had a depressed and tearful mood, latent speech, and decreased psychomotor.  She had normal eye contact, linear and relevant thought processes, no delusions or hallucinations, no suicidal or homicidal ideations, good insight, normal concentration, intact recent and remote memory, and intact fund of knowledge. She had an antalgic station and gait and used a cane.  R. 1007-08, 1261-62.  A PHQ-9 screening test showed severe depression.  Dr. Adaramola continued her prescriptions and assessed that Feagans-King was experiencing a major depressive episode with several stressors including financial, medical on chronic pain, and the "loss of her job and financial support."  Dr. Adaramola also stated that the "Worsening of her depression may be due to absence of levothyroxine."[8] Dr. Adaramola would "Reassess after levothyroxine has been restarted." R. 1009, 1263.

On September 28, 2018, Feagans-King saw Dr. Hovland.  She was taking Basaglar insulin and Humalog insulin for her diabetes.  She had been out of Basaglar insulin for two weeks at the time of the office visit.  R. 1230.  On examination, she was in no acute distress and had a slightly antalgic gait.  Dr. Hovland assessed poorly controlled diabetes.  She

---

[8] Levothyroxine is used to treat hypothyroidism, a thyroid hormone deficiency. Levothyroxine (Oral Route) Proper Use - Mayo Clinic, located at www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/, viewed September 9, 2021.

provided samples of Basaglar to Feagans-King and noted that Dr.

Gonzalez ordered diabetic shoes for Feagans-King.  R. 1233.

<u>The Evidentiary Hearing</u>

On January 8, 2019, the Administrative Law Judge (ALJ) held an

evidentiary hearing in this case.  Feagans-King appeared in person and

with her attorney.  Vocational Expert David Sulewski also appeared. R. 32-

76.  Feagans-King's counsel stipulated to the qualifications of vocational

expert Sulewski. R. 36.  Feagans-King testified as set forth below.

Feagans-King lived in a one-story duplex with her spouse.  She did

not drive because her driver's license had expired, and she did not own a

car.  Prior to her Onset date, she worked as an administrative assistant for

the Red Cross.  Before that, she worked as an office clerk scanning paper

documents into an electronic database.  R. 45.  She also previously

supervised the cleaning crew and worked as a systems analyst. R. 46-49.

Feagans-King stopped working on the Onset Date.  At that time her

rheumatologist Dr. Hoffmann wrote a note stating that she could not work

until August 1, 2017.  Dr. Hoffmann later completed a form stating that

Feagans-King was permanently disabled.  The Red Cross terminated her

at that time. R. 57.

Feagans-King suffered from back pain.  Her back hurt almost all the time and the pain was worse when she reached for anything.  The pain went down her legs and felt like oozing hot liquid.  She also had muscle pain in her arms and shoulders.  She also felt shooting pains going down her legs and could only walk for short periods of time due to the pain.  R 50-53.  Feagans-King testified that she had neuropathy in her feet going back to the 1980s.  She could not feel her feet hitting the ground even then.  R. 54.  She used a cane for balance and, at the time of the hearing, had been using a cane for over a year.  R. 66.

Feagans-King testified that she was not as "bright" as she used to be, "I feel like a lightbulb has gone off in my head instead of coming on."  R. 54.  She also suffered from fatigue which caused sleepiness and "malaise."  She said she felt like she had the flu, "all of a sudden the room started spinning and I have to lay down."  R. 56.  Episodes of high blood sugar also made her sleepy.  Feagans-King took a nap before she came to the hearing, and she said she would probably take a nap after.  R. 68.

Feagans-King opined that she could walk around the block in about 15 to 20 minutes, but she would then have to rest for three hours; she could sit for three to four hours; she could carry less than five pounds

without pain and up to 10 pounds in each hand with pain.  R. 58.  She had a

claw-like sensation in her hands and dropped things as a result.  R. 53, 66.

Feagans-King was taking both long-term and short-term insulin,

gabapentin, Celebrex, Wellbutrin, and Duloxetine.  The gabapentin caused

a little bit of dizziness, and the Celebrex affected her stomach. She did not

have any side effects from the insulin.  She took Duloxetine to counteract

the effect of the Celebrex.  She took a sleeping pill rarely because the

sleeping pill caused grogginess that following day.  R. 59-60.  She took

about 4 sleeping pills a month.  R. 69.

Feagans-King suffered from depression.  She said, "Basically, I feel

like I'm just not worth what I used to be.  It's been really hard, not being

able to work and not being able to do all the things that I needed to do.  I

just don't feel much like a worthy person anymore."  She believed her

physical impairments affected her depression.  She isolated herself from

others about 25 days out of a month.  R. 69-70.

Feagans-King engaged in some household chores and prepared her

breakfast.  She baked cobbler two or three times during the Christmas

holiday season, but she could not stand at the stove for long periods to

cook.  She sometimes helped with the laundry by transferring clothes from

the washer to the dryer.  She occasionally swept, but her spouse did most of the housework.  She mowed grass for 30 minutes at a time.  R. 62.

Feagans-King testified that she engaged in several hobbies.  She crocheted "a lot"; she colored in adult coloring books; she played the violin and several other instruments, including the piano; she engaged in woodworking; and she carved a violin and built a dulcimer.  The dulcimer took over a year to complete.  She spent parts of 5 years working on the violin and was also writing a book on theology.  She previously played the computer game Words with Friends, but she had not played the game for a couple of months at the time of the hearing.  R. 64-65.  Feagans-King said she tired-out easily working on her various hobbies and her hands became painful if she worked on a hobby for too long. R. 67.

Vocational expert Sulewski then testified.  Sulewski identified Feagans-King's past relevant work as an administrative clerk, medical records clerk, a systems analyst, and a janitorial services supervisor.  The administrative clerk and medical records clerk jobs were generally performed as light work according to the Dictionary of Occupational Titles (DOT) published by the U.S. Department of Labor.  Feagans-King performed the work at a sedentary level.  The systems analyst job was

generally performed at a sedentary level according to the DOT and was

performed at a sedentary level by Feagans-King. R. 72-73.

> The ALJ asks Sulewski the following hypothetical question:
>
> I'd like you to consider a hypothetical for us. I'd like for you to
> consider an individual 59 to 60 years of age who has completed
> at least 12 years of education and has the same past relevant
> work that you've just identified. Our hypothetical individual can
> lift and carry up to 20 pounds occasionally and 10 pounds
> frequently. This individual can stand and walk up to two hours
> out of an eight-hour workday and can sit up to six hours out of
> an eight-hour workday. This individual can occasionally climb
> ramps and stairs but never climb ladders, ropes or scaffolds.
> This individual can frequently balance but only occasionally
> stoop, kneel, crouch and crawl. This individual must avoid
> concentrated exposure to extreme heat, cold, wetness,
> humidity, vibration as well as fumes, odors, dusts, gases, poor
> ventilation and hazards, such as moving machinery and
> unprotected heights. If I stopped there, can't this hypothetical
> individual perform the past relevant work?

R. 73.  Sulewski opined that such a person could perform Feagans-King's

prior work as an administrative clerk, medical records clerk, and system

analyst jobs.  Sulewski opined that the person could not work if she was

further limited to performing "only simple, routine and repetitive tasks that

could make only simple work-related decisions."  R. 74.  She could not be

absent from work more than 2 days per month.  She also could not

maintain competitive employment if she was off-task greater than 20% of

the workday.  R. 74-75. The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on March 15, 2019. R. 15-24.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Feagans-King met her burden at Steps 1 and 2 of the Analysis.  The ALJ found that Feagans-King had the severe impairments Sjogren's syndrome, fibromyalgia, diabetes mellitus with peripheral neuropathy, degenerative disc disease of the lumbar spine, and obesity.  R. 17.

The ALJ found that Feagans-King's depression was not severe.  The ALJ found that Feagans-King's depression caused mild limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining space; and adapting or managing oneself.  The ALJ relied on examination findings that she was alert and oriented with intact long-term and short-term memory, normal insight and judgment, normal concentration, and linear thoughts.  The ALJ also relied on evidence that Feagans-King got along well with others and that she could prepare simple meals, perform light housework chores,

shop, count money, and drive a car.  The ALJ also relied on her testimony
that she liked to make musical instruments, crochet, and play the violin.
The ALJ relied on the opinions of state agency psychologists Drs. Deppe,
Kravitz, and Gilliland.  The ALJ found that the opinions of Dr. Adaramola
and Dr. Hoffmann were not supported by their own examination notes and
other evidence in the record.  In particular, the ALJ found that their opinions
that Feagans-King had marked limitations and concentration, attention, and
interaction were not clinically supported.  R. 18-19.  The ALJ found at Step
3 of the Analysis that Feagans-King's impairments or combination of
impairments did not meet or equal a Listing. R. 19-20.

Before addressing Step 4, the ALJ found that Feagans-King had the
following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a range of light work as defined in 20 CFR
> 404.1567(b). She can lift and carry 20 pounds occasionally, 10
> pounds frequently; stand or walk for two hours; and sit for six
> hours in an eight-hour workday. She can occasionally climb
> ramps and stairs; however, she can never climb ladders, ropes
> or scaffolds. She can frequently balance and occasionally
> stoop, kneel, crouch, and crawl. Further, she must avoid
> concentrated exposure to extreme cold, heat, wetness,
> humidity, vibration, fumes, odors, dusts, gases, poor ventilation
> and hazards such as moving machinery and unprotected
> heights.

R. 20.  The ALJ relied on Dr. Chapa's examination and examination notes that showed full range of motion in the upper and lower extremities and normal grip strength.  The ALJ also relied on other examination notes in the record that showed that Feagans-King was able to walk and that she had negative straight leg raising tests. The ALJ also relied on the opinions of Drs. Pardo, Madala, and Greco; and the agency reviewer Anderson.  R. 21-22.  As part of his analysis of Feagans-King's RFC, the ALJ stated, "Additionally, records show that despite having intermittent symptoms of diabetic or peripheral neuropathy, the claimant is non-insulin dependent and her diabetes is moderately well-controlled." R. 22 (citations to the record omitted).

After determining the RFC, the ALJ found at Step 4 of the Analysis that Feagans-King could perform her prior relevant work of administrative clerk, medical records clerk, and systems analyst as they were performed generally according to the DOT.  The ALJ relied on vocational expert Sulewski's opinions that Feagans-King could perform these jobs at the level described in the DOT, "Assuming the claimant's residual functional capacity as assessed by the undersigned herein, the vocational expert testified that the claimant would be able to perform requirements of these three jobs, based on this description [the DOT job description]."  R. 23.

The ALJ concluded that Feagans-King was not disabled at Step 4 of the Analysis. R. 23.

Feagans-King appealed the decision. On March 25, 2020, the Appeals Council denied Feagans-King's request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R.1. Feagans-King then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision generally is supported by substantial evidence, but the ALJ made one error that requires reversal.  The ALJ's decision at Step 2 that Feagans-King's depression was non-severe was supported by substantial evidence.  The opinions of psychologists Drs. Deppe, Kravitz, and Gilliland supported the decision.  The decision was also supported by the numerous examination notes by several physicians, including her psychiatrist Dr. Adaramola, that she had intact recent and remote memory, normal concentration, lineal thought processes, good insight, and good judgment.  The findings were also supported by her statements that she engaged in numerous hobbies including crocheting, woodworking, adult coloring books, playing music on several instruments, and writing.  Her statements, the expert opinions, and the normal examination findings also provide substantial evidence to discount the opinions of Drs. Adaramola and Hoffmann as inconsistent with their own finding and other evidence in

the record.  See 20 C.F.R. § 404.1520c(b)(2) and (b)(3). (The most important factors for evaluating medical opinions are consistency and supportability).

Feagans-King repeatedly asserts that Dr. Deppe did not review her medical records and Dr. Kravitz relied only on the opinions of Dr. Deppe. Dr. Deppe, however, reviewed Feagans-King's records from her primary care physician Dr. Breeden.  R. 695.  Dr. Kravitz relied on Dr. Deppe's report.  The ALJ did not err in relying on these opinions.  Feagans-King also ignores Dr. Gilliland's opinions that agreed with Drs. Deppe and Kravitz that Feagans-King's depression was non-severe.

Feagans-King relies on screening test results and Dr. Adaramola's diagnosis of severe depression as evidence that she had a severe impairment.  The diagnosis establishes that Feagans-King had a medically determinable mental impairment.  The existence of a medically determinable impairment alone, however, does not establish that the impairment is severe for purposes of Step 2.  See 20 C.F.R. § 404.1522. To be severe, for purposes of Step 2, the medically determinable impairment must have a more than minimal effect on the claimant's ability to work.  20 C.F.R. 404.1520(c); SSR 85-28 (January 1, 1985).  Drs. Deppe, Kravitz, and Gilliland all found that her impairment caused only mild

limitations on her ability to function.  These findings, along with the other evidence cited above, provided substantial evidence to support the ALJ's finding that Feagans-King's mental impairment was non-severe at Step 2. See 20 C.F.R. § 404.1520a(d)(1) (mild functional limitations indicates that a mental impairment is not severe).

Substantial evidence also supported the ALJ's determination at Step 3 that Feagans-King's impairments or combination of impairments did not meet or equal a Listing.  Feagans-King argues that her mental impairments met a Listing.  As discussed above, the ALJ's determination that her mental impairments were non-severe was supported by substantial evidence.  The Listings for mental disorders such as depression require marked or severe limitations on functional areas.  See e.g., Listing 12.04(B).

The ALJ, however, erred in stating that Feagans-King was not insulin-dependent. The record shows that she was insulin-dependent by the time of the hearing.  Dr. Breeden stated on October 4, 2017 that she would become insulin-dependent if she could not control her diabetes through lifestyle changes.  Dr. Breeden came to this conclusion because Feagans-King either could not afford or could not tolerate other medications for her diabetes.  Dr. Hovland subsequently prescribed insulin for Feagans-King in 2018.  Feagans-King's condition at the time of the hearing in 2019 was

relevant because her Date Last Insured was in 2021.  The ALJ based the
RFC finding, in part, on his erroneous finding that she was not insulin
dependent.  R. 22.  The court cannot determine the importance of this
erroneous finding on the ALJ's RFC finding.  The ALJ, therefore, failed to
build a logical bridge from the evidence to his conclusions.  The Court must
reverse the decision and remand the case for further proceedings.

Feagans-King also asks the Court to reverse with directions to award
benefits.  Such relief is not appropriate in this case.  See Allord v. Astrue,
631 F.3d 411, 415 (7th Cir. 2011) (A court should order an award of
benefits "only if all factual issues involved in the entitlement determination
have been resolved and the resulting record supports only one
conclusion—that the applicant qualifies for disability benefits.").  As
explained above, factual issues remain.  The issues include, but are not
limited to, the impact of Feagans-King's diabetes on her RFC.  The request
for an award of benefits is denied.

THEREFORE, IT IS ORDERED that Plaintiff Frances Feagans-King's
Motion for Summary Judgment and Memorandum of Law in Support of
Vacation/Remand of Decision Denying Disability (d/e 18) is ALLOWED in
part; Defendant Acting Commissioner's Motion for Summary Affirmance
(d/e 22) is DENIED, and the decision of the Defendant Acting

Commissioner is REVERSED and REMANDED for further proceedings

pursuant to 42 U.S.C. § 405(g) sentence four.

ENTER:   September 14, 2021

*s/ Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE